14-1908, 14-3922, and 17-2623, Mr. Ureland. May I proceed? Yes. May it please the court. I'd like to focus my argument this morning primarily on the sufficiency of the venue with respect to the Lindbrook robbery, which was counts 5 and 6 of the redacted indictment. There's no dispute that that robbery occurred in the Eastern District of New York. The district court found that venue was proper because Rezati, the victim, purchased ice cream in the Southern District of New York, and therefore, quote, it would be reasonable for a jury to infer that by robbing Rezati of a significant sum of cash accumulated from his ice cream business, defendant caused at least a slight effect on his economic ability to purchase ice cream in the Bronx based on the same quantities. The district court's finding is unsupported by the verdict because, by the record I should say, even if the stolen cash originated from Rezati's ice cream business, there is no evidence in the record that he continued to use that cash for his ice cream business. Indeed, the district court sustained an objection when the government tried to elicit that very And the evidence is very clear that what Rezati was using the money for was his loan sharking business. While Rezati denied the fact that he was actually a loan shark, I think the government itself acknowledges that he was engaged in loan sharking, and that's what the cash in his ceiling was for. I think the government recognizes as much in the problem with that evidence because they now make the argument, not relied on by the district court, that Venue can be based on preparatory acts occurring in the Southern District of New York prior to the robbery. The government relies on United States v. Davis, but Davis doesn't help the government since Davis involved an attempt, and the elements of an attempt to fend are completely different from a substantive robbery charge. The more relevant case is this court's recent decision, this past July, in United States v. Purcell, 967F3159. In Purcell, the court found Venue lacking for a charge of enticement to engage in unlawful sexual activity. There were three different victims, and the court went through the evidence as to each of them, but the government argued that Venue was proper in the Southern District because the defendant had traveled through the Southern District to meet the victim. This court disagreed since the charge was meeting with the victim, trying to entice her, not traveling to the meeting, and it reaffirmed its holding in Beechna and in Solove that preparatory acts are insufficient to establish Venue. That's what we have here. That's what the government's relying on here. They're arguing on the acts taken by McIntosh and others. Did you cite to Purcell? Purcell was decided after a briefing in this case. So based on that, and I believe we cited Beechna, that basis, those acts are just simply insufficient to establish Venue. So the court does not need to get into this thicket concerning whether an effective uninterested commerce can support Venue or not, although there is no way to reconcile such a rule with this court's holding in Ramirez, which Judge Walker was on, because the focus is the conduct, and interstate commerce is not a conduct element, nor does the court have to go into, but I think if it does, we can get the better of it, whether a preponderance versus beyond the reasonable doubt standard applies. Counsel, when does the preparatory phase end and the crime start? I mean, my understanding is that the night of the robbery, they were in the southern district before they went to the eastern district. So go ahead. And it's when they're coming into the victim's house and trying to, you know, rob from them, that's when the offense takes place. The fact that they drive before, that's not part of a robbery. The government could have charged him with a 10 and all the preparatory acts, but that's not an element of the offense, those acts. So, if the house were on the eastern, if there was a border between two districts and the house is on one side and the road was on the other side, and they were walking across the line, the border, into the house to rob the person, the place, the road side of it would not count. I mean, you know, the robbery begins, what does the robbery begin with? When they see him and tell him that you're under, you know, I've got a gun and you've got to turn over the money or can it be before that? What about opening the door to get in? I mean, at what point does the preparatory acts, is it no longer preparatory acts? I mean, in this particular case, they drove from the Bronx to the victim's home and back to the Bronx and that was on the reconnaissance. But the night that they did it, they drove to Long Island and Wolf waited nearby and they conducted the robbery and then held him at gunpoint and then, you know, and then  Judge Walker, to go back to your initial question, yes, there can be a circumstance, you know, where they're right by the border. But I don't think it's any different than from Purcell, where the victim clearly drove through the Southern District of New York in order to get to the victim. And this court said that's not enough. It's not about traveling to the offense. It's about where the offense starts. So the question is, when a robbery offense, there are elements to a robbery. Those elements are taking place, the threats of fear, the obtaining money from the victim, that's what the focus has to be on. When that conduct is committed, that's where that's where the conduct is. Then Purcell cited Solov also, where the defendant was driving to commit a And the court said that's not it's not about traveling to. It's not about the acts that are done before that. I asked a question on that very point there, Mr. Yearwood. It was more here, though, than just traveling. As Judge Walker was discussing, there was not only surveillance going back and forth between the Bronx, but they recruited a co-conspirator there. Correct. And they also obtained cars and weapons. Obtaining the weapon, and this is, of course, robbery, you know, which involved weapons. So isn't that a distinguishing factor, that there was so much that was done in the Bronx other than just travel? Just answer. I don't I don't think so, because every offense is going to involve some preparation. But the point is, he could have been charged separately for that preparation. He was charged for the substantive act of robbery. And it just it's you know, that evidence would be admissible to show his intent to rob. But the question is now the question is, is this robbery of those the elements that constitute the robbery? Reconciling the place is not he can't be convicted of a substantive robbery for just, you know, staking out the place because conviction would be unsupported by that. This court would not accept it. It would accept a conviction for an attempt on that, but not for the substantive robbery. And the point is, if the government wants to prosecute him in Manhattan or the Southern District for that conduct, they have to have the offense committed there. They want to. That's what the Constitution requires. Thank you very much. You've reserved some time for rebuttal. We'll hear from the government. May it please the court. My name is Sarah Krisoff. I represent the United States in this matter. I also represented the United States at the trial in this matter below. I'll jump right to venue as that's where Mr. Yerowitz focused his discussion and the accounts related to the robbery of Mr. Rezati. With regard to venue, as we set forth in our briefing, the government has has two theories of venue, both of which we think are sufficiently supported by the evidence. The defendant is a heavy burden here, given the jury's verdict. And I don't think he has he he meets that burden. First of all, the venue is appropriate in the Southern District of New York because interstate commerce in the Southern District of New York was affected. And that was the sort of crux of Judge Stein's opinion below regarding venue. And it was certainly reasonable for the jury to infer that by robbing Mr. Rezati of a significant amount of cash accumulated, at least in part from his ice cream business, that the defendant caused the requisite very slight effect on interstate commerce by causing an effect on Rezati's economic ability to purchase ice cream from the box distributor where he purchased ice cream. And that Mr. Rezati was using the money for for money lending that there is no testimony in the record regarding that Mr. Rezati was asked specifically, where did that money come from? He testified that it was from his work over the years. He had when asked at the very beginning of his testimony, what was his work? He said, I'm a wholesale ice cream guy. That's what I do. He did say he had engaged in other business endeavors. That was certainly part of the record as well. But there's no evidence that the money that was taken from him was part of those business endeavors. And in any event, I think the law is clear that even if some of those proceeds had been from another business, that wouldn't diminish the interstate commerce effect here. And the standard here is fair preponderance, isn't it? I mean, for venue, it's not an element of the offense, so it doesn't have to be beyond a reasonable doubt. That's correct, Your Honor. We all this court's decisions have reaffirmed that the that the standard here is preponderance of the evidence and the government certainly met that in the evidence that presented at trial. In addition to the interstate commerce basis for venue, there is a basis, a strong basis based on Davis and the acts that were performed in connection with this robbery in the Southern District of New York. As Your Honors had pointed out, this is a case that's very different than Purcell. Purcell was a case where the contacts with the district were much more limited, involved traveling through the district and things like that. And in this case, the contacts with the district were even much more significant than the contract contacts with the district at issue in Purcell, I mean, in Davis, excuse me. In Davis, there was a call placed during the course of the robbery to the Southern District of New York in order to sort of for the perpetrator to get more assistance with the robbery, to generate more people to help them with the robbery. In this case, numerous substantial steps and furtherance of the robbery took place in the Southern District of New York. First, as Your Honors noted, there was the reconnaissance trip where they traveled from the Bronx to Long Island to take pictures of the location, Mr. Rezati's home. Second, there was extensive traveling in the Bronx and this other areas of the Southern District of New York in order to gather up all the co-conspirators to affect the robbery. I think Cooperator Wolf went to went to from Dutchess County down to the Bronx to meet McIntosh. They then went to get and recruit another participant for the robbery known as Julian. And then very importantly, they went to McIntosh's home to get the gun and the taser in order to conduct this robbery. And then they go finally to, after all those important and essential steps that are sort of part and parcel of this robbery, they go to conduct the actual robbery. And after the robbery, in order to conceal that the robbery took place, they flee and they go back to the Bronx in order to divide up the proceeds and conceal the weapons and the items that were taken during the robbery. So all of those things are not preparatory steps, but rather sort of really essential parts, substantial steps in furtherance of the robbery. Are you going to be addressing the issues of Counts 7 and 8 that Judge Stein found ruled on in a Rule 29 motion? I can turn to that, Your Honor. Yes, absolutely. Your Honor, that's, I think, believe Counts, the numbering has changed over time because of the indictment was remanded for trial. I think I have referred to that. This is the Poughkeepsie robbery. The Cliff Street robbery was the, the robbery in Yonkers was the Rule 29. Yonkers, I'm sorry. Yes. Let me turn to that, Your Honor. As your owners are well aware, the fact could have found the essential elements of the crime here at there was more than sufficient evidence of intent to rob. There's really sort of two bases for the jury's verdict with regard to intent to rob. First of all, the course of events itself provided a factual basis from which a reasonable jury could have inferred McIntosh's intent to rob. This was circumstantial evidence of McIntosh's intent to rob, but certainly evidence that the jury was entitled to rely on in reaching its verdict. Evidence that McIntosh and his co-conspirators went to Yonkers that day to commit a robbery of marijuana dealers. When that robbery did not go forward, McIntosh and his co-conspirators engaged in a dice game with narcotics traffickers on Cliff Street and a dispute arose. We know that that dispute started, the genesis of that dispute was was an individual named Biggs, who was a narcotics trafficker, drinking out of the liquor that they had jointly put in money for. But that dispute quickly escalated to an attempted robbery. This group, as the co-operators testify, was a group of opportunists. They took, sometimes they planned the robbery, sometimes they didn't. When they saw an opportunity to, for lack of a better term, go into the pockets of individuals they understood to be drug dealers or individuals they understood to be businesses, they took that opportunity. In this case, McIntosh demanded money back from these other drug dealers at Cliff Street, these drug dealers at Cliff Street. And then immediately after he demanded money, he went to his car, he got a shotgun. Another member of the crew got another firearm and they proceeded to attack these individuals on Cliff Street. McIntosh assaulted and both McIntosh and a co-conspirator shot. The victim was hit during the course of this attempted robbery. And sure, right after this, they fled and they conducted yet another robbery. So all of those things, even I think putting aside the co-operator testimony, are circumstantial evidence of McIntosh's intent to rob. But there's more, Your Honor. We have three cooperating witnesses who testified regarding McIntosh's intent. Mr. Ramirez, Mr. Duhaney and Mr. Lee. And Judge Stein, you know, I think inadvertently discounted their testimony. He did not find them incredible. He in fact said that the co-operators were were credible and corroborated. But I think he improperly discounted their testimony and usurped the jury's role here, which was really it was really the jury's role to. Do we have to deal with the equipoise rule in assessing this issue? I don't think so, Your Honor. I think that there was and I think Your Honor sort of went back to these these principles in the recent decision in Archer, although that was a Rule 33 decision. You discussed the Rule 29 principles. But I think that even if, first of all, Judge Stein didn't really unpack, he didn't really address Duhaney and Lee's testimony. He said it was equivocal, but he didn't really dig into that testimony. With regard to Ramirez's testimony. Normally, am I correct? Normally, the equipoise problem comes up when you have you have circumstantial evidence and it can be it has an innocent explanation and a culpable explanation. And so it may be an equipoise. Where you're dealing with witnesses testimony, it seems to me there, you know, I mean, I think there's aspect of it, I suppose, that the district judge says it's an equipoise and he's the district judge is the is the determiner of credibility. I guess that would that would apply. But it seems a little different than just circumstantial evidence when a witness is testifying. There, it seems that that's quintessentially the jury's role, isn't it? That's right, Your Honor. And I think that's really with regard to the testimony of Ramirez, Judge Stein sort of he he made a different inference regarding the testimony of Ramirez. But that is certainly not the only permissible inference to be drawn. This was an argument that was sort of central to trial. This was an argument that McIntosh made at trial and and the jury flatly rejected. And I think it is there there was more looking at both the testimony of those three cooperators and the circumstantial evidence. There was more than sufficient evidence of intent here. So your view is, for example, we don't have to really deal with or distinguish our part where we're as Judge Walker mentioned, in the context of direct evidence that's really not contradicted. It's it's enough. So the Equipoise rule doesn't apply. I think that's correct, Your Honor. OK. Might I ask you to just take a moment to discuss, I know that Mr. Jurowitz is waiting for a rebuttal and maybe he can also talk to us a little bit about the forfeiture issue, which is a slightly unusual issue, it seems to me. Yes, Your Honor. In terms of I guess the issue before the court now is the timing of the forfeiture order. And there's no question that the government made a mistake below in terms of not submitting the formal restitution and forfeiture orders to the court immediately after the sentencing. And we we had the opportunity to litigate this below before Judge Stein and discuss all the reasons for that and how that happened. And Judge Stein, I think, properly decided that the rule here is a time related directive. The rule 32.2, which would govern the district court's ability to enter a forfeiture order now, or in this case in 2017, is a time related directive. In this case, it's particularly, this is sort of, I think, in accord with the 11th Circuit's decision in Farias. This is a situation where the defendant was fully, not only was he on notice of forfeiture, but forfeiture was litigated and decided and orally pronounced. So we had, it's not the situation, which is some of the cases that the defendant cites where forfeiture was not, the forfeiture issue was sort of left open. In this case, by the time the sentencing was concluded, the forfeiture issue was was resolved. He's making a claim of prejudice, largely, as I understand it, related to the value or depreciating value of this BMW. But how do we deal with that? Your Honor, I think the only sort of prejudice he can possibly claim is the BMW. And so with regard to the BMW, it doesn't, first of all, the defendant could have moved at any time for an interlocutory sale of that car. The rules allow that to the extent the defendant was aware, was not aware of that. Even in 2017, Judge Stein, when this case was on remand before him, made sure the defendant was aware he could move for that interlocutory sale. He has never done that. He has never asked us to do that. And in fact, the government has asked Mr. McIntosh to consent to the sale of the BMW. And that was some time, I think, even before our filing of our main brief. And he still has not consented to the sale of the BMW. I think the regime is in place to allow for the sale of the assets to avoid the depreciation, allows the defendant to ask for the sale. He hasn't done that. The government has not done that. The car remains sitting in the lot. I mean, at the West District Court. In other words, do you think that, I'm looking at how the summary order or the opinion, if we were to agree with you, would read, would the summary order really deal with just the facts of this case and the fact that McIntosh never pressed the issue? Or would it deal with the fact that this is a time-related directive? And if it's a time-related directive, then it doesn't matter, right, what he did, what they did. The government gets to forfeit. Your Honor, I've seen that, you know, when I look back at the cases at the various circuits and courts that have addressed this, they frankly, some have addressed it one way and some have addressed it the other way. I mean, I think that they have, the courts have said this appears to be a time-related directive, particularly in circumstances where the defendant was fully on notice of the forfeiture and knew of the forfeiture numbers. And it was really more of an administrative issue, not a substantive issue regarding forfeiture. In any event, would you agree, what is the purpose of the deadline? You know, I think there are arguments either way. This helps the defendant, it can be used by a defendant as it is here, or is it really designed to speed the government's processing of forfeitures to benefit the victims? Because forfeiture money, although not restitution, could be paid to victims. I think if you look at the, sort of guided by the principles of the Supreme Court in Dolan, if you look at the decision in Martin from the Fourth Circuit and Farias, which I think was from the Eleventh Circuit, they're really, I think, focused on the fact that this appears to be rules that are set to sort of ensure the proper and speedy and, you know, to move the courts forward, to move things forward, and not a jurisdictional bar. And so I think the principles... So understanding that, let's just take a hypothetical that it's not two and a half years, but several years later. And let's also assume that the defendant was notified of the possibility of forfeiture, both in the indictment, as in this case, and at sentencing, but that the preliminary order of forfeiture was not, for whatever reason, submitted until several years later. Are there no ramifications or consequences to that significant a delay? I mean, at some point, even if we agree with you, and I don't, I mean, I'd agree that it's a time-sensitive, time-related directive to the court, but at some point, there must be a consequence, no? And what is that consequence? I mean, I don't see it as much as sort of a particular time in which it is sort of a cutoff, right, but rather sort of looking at the fairness of a particular situation and the circumstances under which forfeiture was ordered or not ordered. So in this case... My hypothetical is designed to relieve you of thinking about that. Let's just assume that the delay in this hypothetical was so significant that everybody would agree that there's some unfairness. Well, I mean, in this case, this is a case where the delay was long, right? So we have a case where because of the defendant's decision to sort of not pursue the direct appeal very quickly, the issue was not raised until the defendant briefed it in his direct appeal, which was many years after the trial here, right? And so then we, with the defendant's consent, asked this court to remand it, Jacobson remand to the district court to decide forfeiture. And at that time, the district court determined that it was still appropriate to enter a preliminary order of forfeiture against the defendant. So in this particular case, I don't think the hypothetical you speak of actually, I think is this case, right? Because it's not that we just missed the deadline by a week or two, but admittedly, this didn't come to the government's attention until the defendant raised it in his appeal. I mean, this is a situation the defendant could have raised with us at any time. He did not do that. I don't make it. It's not his duty to do that. The government should have done this. But it's hard for him to argue of prejudice, particularly related to the BMW, which I think is his only argument of prejudice when he sort of didn't raise the issue with us. That's my problem. I mean, it's a problem that we've got to work out because we have no, we don't have precedent in this particular area, it seems to me. And, you know, I think that Judge Duncan's opinion and Martin is helpful. The 11th Circuit is helpful. But the problem is that I think you're suggesting a solution whereby the defendant has to, at some level, say, oh, there's no, you haven't filed a preliminary order of forfeiture. Please file it. That can't, that cannot be the rule that it's on the defendant to suggest that. No, Your Honor, I don't, this was clearly, the government clearly takes responsibility in this case. And as we should, it was, we had a directive from the court to do it and we didn't do it. I don't, that's not a question here. And we accept the responsibility for that. I think that, but in this case, I was just speaking to sort of the prejudice here that the defendant is articulating. That's what I was speaking to, not sort of the burden. Obviously, it is the government. But in describing the prejudice, you're also baking into that the fact that he did not until late in the day bring the issue up. And I think that seems to be problematic to me in the same way, for example, that, you know, it's speeding by, it's not up to the defendant to raise that. And once it lapses, it lapses. Well, I mean, I just think that then we sort of go back to the principles of statutory interpretation and the interpretation of this rule, right? And so I think that in looking at, that the rule doesn't set out any consequences. The rule itself does not set out consequences for noncompliance. We look at the purposes behind the statute. Mr. McIntosh stole a lot of money from victims here. We have agreed now to a restitution order for some of those victims, but the forfeiture money judgment is another vehicle under which to obtain money to remit to those victims. And so I think we look at those principles and look at sort of who would be harmed by an application, a sort of a stricter application of this rule. And in this case, I think it would be, there's the opportunity for third parties really to be harmed by a sort of strict application. It needs to be done within a week. Unless there are any other questions from my colleagues, I've kept you well past your time, Mr. Urowitz. Yes, thank you, Your Honor. Just working my way back, as far as the forfeiture, I see the government saying, I agree largely with the comments you made, Judge. No, questions, questions, not comments. The observations that the government basically is putting everything on the defendant. He didn't raise it early enough. He didn't consent to sell the car, which in his view, it's not proper forfeiture. He's challenging the underlying conviction to that count. And when the government talks about restitution going to the victim, forfeiture money going to the victim, the government already agreed that as far as the Lindbergh argument, where this money supposedly was derived from, there's no restitution to the victim because these were criminal proceeds and they declined restitution on that. And frankly, I've been in a lot of cases, I rarely see, yes, there is a procedure where forfeiture can go for restitution. But I've never had a case that that's happened and it requires government consent. The forfeiture statute is different from the restitution statute. The forfeiture is a punitive punishment to the defendant and the money goes to the government. As far as the venue is concerned, the elements of a robbery offense, the district court charge, were the obtaining of property by instilling a fear. Those elements all took place in the Eastern District of New York. The government's reliance on Davis, and Davis said this specifically, that's an incoherent offense. An incoherent offense requires, it could be a continuing offense. Conspiracy is a continuing offense. It has a different venue standard. That's 3237. That's not what we have at issue here. As far as the Cliff Street robbery, the government says, the record says Macintosh demanded money from the victims. That was the government's quote. If you look at the citation, the record, where that comes from, that's A325 at T742. Macintosh said, quote, I want my money back. This was all about the money that he was seeking was money because he paid for a bottle and this guy Biggs drank from it. The evidence supports that Macintosh engaged in an assault, but that's not what he was charged with. The district court found it may be that the other defendants intended to rob. They walked away. They had their own private conversation that Macintosh was not present at, at which they discussed the robbery. Macintosh, the district court found specifically, was not involved in that. And just this one final point, even if the court were to disagree on that, there's a can survive. I submitted late last night, a 28 J letter. The fourth circuit has just concluded that an attempt at Hobbs Act robbery is not a crime of violence. And the fourth circuit's decision is wholly consistent with this, this court's revised decision in Barrett. The court initially had concluded the conspiracy to commit Hobbs Act robberies. That issue is pending before other panels. Yes, yes. So that may be out of our hands. I know it is. It is pending another case. Just one final observation. The government says that the cash, oh, it was from the ice cream business, not the loan shark in business. There was no evidence. He denied that it was a loan shark. The district court in finding the interstate commerce elements specifically relied on the fact that he was engaged in a loan shark. It's a little odd to say that there's no evidence of loan sharking when the district court at 8462 relied specifically on that. This was all about the ice cream business, money that he may have obtained from the ice cream business. But now there's no evidence that this was anything to do with future purchases of ice cream. I would think most people don't purchase in a wholesale business ice cream for cash. Regardless, the district court sustained the objection when the government tried to elicit that evidence. Thank you very much. Thank you.